IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

THOMAS E. NIDIFFER, and
LAURIE-LYNN FRANCESE,

     Plaintiffs,

v.                                1:22-cv-00374-MV-JMR

DAVID LOVATO, *Officer*;
ARMANDO CAMPOS, *Officer*; and
ZACHARY SISEMORE, *Officer*;

     Defendants.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

THIS MATTER comes before the Court on the parties' cross motions for summary judgment. Docs. 40, 45. Defendants filed a Motion for Summary Judgment: Dismissal of Plaintiffs' Claims Based on the Application of Qualified Immunity. Doc. 40. Plaintiffs filed a response and their own Cross Motion for Summary Judgment in the same document. Doc. 45. Defendants filed a reply. Doc. 50. Then, defendants filed a response to the Cross Motion for Summary Judgment. Doc. 51. Plaintiffs did not file a reply. The parties filed a Notice of Completion of Briefing for both motions on the same day. Docs. 52, 53. Both parties requested hearings. *Id.* The Honorable Senior District Judge Martha Vázquez referred the case to me pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (b)(3) to conduct hearings, if warranted, and to perform any legal analysis required to recommend to the Court an ultimate disposition. Doc. 69.

Having reviewed the submissions of the parties and the relevant law, I conclude that the defendants are entitled to Qualified Immunity. Therefore, I recommend the Court GRANT the defendants' Motion for Summary Judgment, DENY the plaintiffs' Cross Motion for Summary Judgment, and dismiss the case with prejudice.

## I.     The Complaint

Plaintiffs Thomas Nidiffer and Laurie-Lynn Francese allege two Fourth Amendment violations in their complaint. Doc. 77 at 4.[1] In Count I, plaintiffs allege that their right to be free from unreasonable searches was violated when the defendants climbed over the plaintiffs' locked gate into their front yard. *Id.* In Count II, Mr. Nidiffer alleges that his right to be free from unreasonable searches was violated when the defendants called the New Mexico Department of Health ("NMDOH") to access his "private medical information." *Id.*

Defendants are three Edgewood Police Department officers. *Id.* at 1–2.

## II.    Undisputed Material Facts

On May 24, 2019, defendant Officers David Lovato, Armando Campos, and Zachary Sisemore were dispatched to Mr. Nidiffer and Ms. Francese's home. Doc. 40 at 4; Doc. 45 at 3. The officers were responding to a report that someone was growing and selling marijuana from the home. *Id.*

The Nidiffer-Francese home is in a residential, albeit rural, neighborhood in Edgewood, New Mexico. Doc. 41, CD 0:00:52-0:01:20 (Exh. A). The home is surrounded by chain-linked fence with a farm gate. *Id.* When the gate is locked, the front door cannot be reached without climbing over the fence. *Id.*

When the officers arrived, the plaintiffs' gate was locked. *Id.* Officer Lovato sounded an airhorn twice to get the homeowners' attention. Doc. 40 at 5; Doc. 45 at 4. Mr. Nidiffer and Ms.

---

[1] Per court order, plaintiffs filed a cured complaint (Doc. 77). The cured complaint and the original complaint (Doc. 1) are identical save for the addition of plaintiff Laurie-Lynn Francese's signature. The Court recognized the cured complaint *nunc pro tunc* to the filing date of the original complaint. Doc. 78.

Francese did not hear it. Doc. 40 at 5–6; Doc. 45 at 4. The officers then climbed over the locked gate and approached the front door. Doc. 40 at 6; Doc. 45 at 2.

After the short walk up the driveway,[2] the officers met Mr. Nidiffer at his front porch. Doc. 40 at 6; Doc. 45 at 5. The officers asked to search or "walk around" the property. Doc. 40 at 6; Doc. 45 at 5. Mr. Nidiffer did not consent. Doc. 40 at 6; Doc. 45 at 5. Instead, he asked the officers to leave. Doc. 40 at 6; Doc. 45 at 6. They did. Doc. 40 at 6; Doc. 45 at 6.

Sometime after leaving the home, the officers called the NMDOH to ask whether Mr. Nidiffer was a registered grower with the New Mexico medical marijuana program. Doc. 40 at 7.

## III.    Legal Standard

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on the issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Facts that do not affect the outcome of a case are not material facts, even if in dispute. *Id.*

Qualified immunity-based summary judgment motions, however, are somewhat different from other summary judgment motions. *See Romero v. Fay*, 45 F.3d 1472, 1475 (10th Cir. 1995). Qualified immunity shields government officials performing discretionary functions from liability for civil damages unless the official's conduct violates clearly established statutory or constitutional rights of which a reasonable person would be aware. *Harlow v. Fitzgerald*, 457

---

[2] Plaintiffs point out that while the officers walked up the driveway, they visually inspected the area—peering into the windows of the two parked cars. Doc. 45 at 5; Doc. 46 (Exhs. 4, 5). This fact is not material. The "search" in this case began prior to the officers' walk up the driveway—that is, when the officers first hopped the fence and entered the curtilage of the plaintiffs' home.

U.S. 800, 818 (1982). While the initial summary judgment burden is generally on the movant, "[w]hen a defendant raises the qualified immunity defense on summary judgment, the burden shifts to the plaintiff to meet a strict two-part test." *Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000). After qualified immunity is asserted, the plaintiff must show (1) that the defendant's conduct violated a constitutional or statutory right, and (2) that the law governing the conduct was clearly established when the alleged violation occurred. *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1255 (10th Cir. 1998).

The Court is not required to address the two prongs of the test in order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The Supreme Court's decision in *Pearson* permits courts to grant qualified immunity without first deciding whether a constitutional violation occurred so long as the right claimed to be violated was not clearly established. *Id.* The right that is alleged to have been violated must be "clearly established" not just as a general proposition (for example, in the way the right to free speech is clearly established), but "in a more particularized . . . sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Stating the right too broadly would destroy the balance that the Supreme Court has sought to establish "between the interests in vindication of citizens' constitutional rights and . . . public officials' effective performance of their duties by making it impossible for officials reasonably to anticipate when their conduct may give rise to liability for damages." *Id.* at 639 (quotation and citation omitted).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Fogarty v. Gallegos*, 523 F.3d

1147, 1161 (10th Cir. 2008) (internal quotations omitted). "The plaintiff is not required to show, however, that the very act in question previously was held unlawful . . . to establish an absence of qualified immunity." *Weigel v. Broad*, 544 F.3d 1143, 1153 (10th Cir. 2008) (internal quotations omitted). The degree of specificity required depends on the egregiousness of the challenged conduct; "[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004).

Indeed, the doctrine of qualified immunity protects government officials, including police officers, "from undue interference with their duties and potentially disabling threats of liability." *Emmett v. Armstrong*, 973 F.3d 1127, 1131 (10th Cir. 2020). Consequently, section 1983 liability only attaches to "the plainly incompetent or those who knowingly violate the law," *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (internal quotation omitted), not those who "make reasonable but mistaken judgments." *San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015).

On motion for summary judgment based on qualified immunity, the Court must view the facts and draw all reasonable inferences "in the light most favorable to the party asserting the injury." *Scott v. Harris*, 550 U.S. 372, 377 (2007). Usually, that is the plaintiff. *Id.* at 378. The Court's function "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. There is no issue for trial "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

Finally, pleadings by *pro se* litigants are "to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). That means "if the court can reasonably read the pleadings to state a valid

5

claim on which the plaintiff could prevail, it should do so. . . ." *Id.* Still, a Court may not "assume the role of advocate for the *pro se* litigant." *Id.*

## IV.   Analysis

In their complaint, plaintiffs allege two violations of their Fourth Amendment rights to be free from unlawful searches. First, plaintiffs allege that their Fourth Amendment rights were violated when the defendant officers jumped over the locked gate into plaintiffs' front yard. Doc 77 at 4. Second, Mr. Nidiffer alleges that the defendants violated his Fourth Amendment right by accessing his "private medical information" when the officers called the NMDOH to ask whether Mr. Nidiffer was a licensed medical marijuana grower. Doc. 77 at 4; Doc. 40 at 19. In defendants' Motion for Summary Judgment, defendants contend that they are entitled to qualified immunity as to both counts. *See generally* Doc. 40. In plaintiffs' response to the defendants' Motion for Summary Judgment and in their Cross Motion for Summary Judgment, plaintiffs argue that qualified immunity "is not relevant" to this case and that the qualified immunity defense was already rejected by the Court. Doc. 45 at 11. As discussed below, I agree that defendants are entitled to qualified immunity as to both counts. Therefore, I recommend the Court grant the defendants' motion for summary judgment and deny the plaintiffs' cross motion.

Because the arguments made in the parties' competing motions for summary judgment and their respective responses are the same, I analyze both motions together.

### A.  Qualified immunity is the applicable law.

In plaintiffs' Cross Motion for Summary Judgment, they argue that qualified immunity does not apply here. Doc. 45 at 7, 11. Plaintiffs reason that "[t]he Doctrine of Qualified Immunity has never been codified by any legislation or executive order." *Id.* at 7. And "two states within the Tenth [Circuit] . . . have outlawed its use," referring to New Mexico's and

Colorado's recent laws ending qualified immunity at the state level. *Id.* at 11; *see* N.M. Stat. Ann. § 41-4A-4 (2021); C.R.S. § 13-21-131(2)(b) (2021). Defendants assert that they are entitled to qualified immunity and that the plaintiffs cannot succeed because they do not cite any legal authority. Doc. 50 at 1–5; Doc. 51 at 1–5. I agree with defendants that qualified immunity is the applicable law in this case.

Qualified immunity applies when government officials are sued for civil damages for performing discretionary functions. *Harlow*, 457 U.S. at 818. "Vertical stare decisis is absolute and requires [lower courts] . . . to follow applicable Supreme Court precedent in every case." *United States v. Guillen*, 995 F.3d 1095, 1114 (10th Cir. 2021). As plaintiffs allude, qualified immunity is a judge-made doctrine created in the 1960s. *See Pierson v. Ray*, 386 U.S. 547 (1967). While politically controversial, its legal status is clear. The Supreme Court of the United States has consistently upheld qualified immunity. *See, e.g.*, *City of Tahlequah v. Bond*, 142 S.Ct. 9, 11 (2021) (per curiam); *Kiesla v. Hughes*, 138 S.Ct. 1148, 1152–53 (2018); *District of Columbia v. Wesby*, 138 S.Ct. 577, 589–93 (2018). This Court cannot and will not disregard Supreme Court precedent.

New Mexico's recent end to qualified immunity under state law has no bearing on this case. The Supremacy Clause of the United States Constitution provides that the laws of the United States, meaning federal laws, are "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Plaintiffs filed this lawsuit in federal court under federal laws: 42 U.S.C. § 1983 and the Fourth Amendment of the United States Constitution. Doc. 1. While New Mexico has state corollaries to § 1983 and the Fourth Amendment, plaintiffs did not file suit under those laws. Nor did plaintiffs file in state court. As such, New Mexico state law does not apply here.

Plaintiffs' claim that this Court has already decided whether qualified immunity applies is mistaken. Plaintiffs argue that they are entitled to summary judgment stating, "defendants are attempting once again to use the Doctrine of Qualified Immunity as a defense, after already bringing it up in their Answer to Plaintiffs' Complaint." Doc. 45 at 2. This argument reflects a misunderstanding of civil procedure. Although defendants do list qualified immunity as an affirmative defense in their answer, the Court did not have occasion to rule on the issue. Doc. 14 at 4. Therefore, the defendants are not "trying for another bite at the proverbial apple," because this Court has not previously decided whether defendants are entitled to qualified immunity. *See* Doc. 45 at 7.

Because this case is a civil damages suit filed in federal court under federal law and defendants were law enforcement officers performing discretionary functions of their job, qualified immunity remains a viable affirmative defense.

**B.  Defendants are entitled to qualified immunity as to Count I.**

In defendants' Motion for Summary Judgment, they contend that jumping over the locked gate into the plaintiffs' front yard was not an unreasonable search. Defendants argue that (1) the officers' entry was lawful under the open fields doctrine and, alternatively, that (2) the officers only conducted a lawful "knock-and-talk." Doc. 40 at 9–17. Plaintiffs argue that their Fourth Amendment rights were violated. Doc. 45 at 8–9. Plaintiffs disagree that (1) their less-than-one acre home in a residential area is an "open field" and (2) jumping over a locked gate is a lawful knock-and-talk. *Id.* I agree with plaintiffs that their Fourth Amendment rights were violated. The right, however, was not clearly established, as required. Therefore, defendants are entitled to qualified immunity as to Count I.

The Fourth Amendment provides the "right of the people to be secure in their persons,

houses, papers, and effects against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. The term "houses" includes the curtilage of a home. *United States v. Carloss*, 818 F.3d 988, 992 (10th Cir. 2016). Curtilage is the "the land immediately surrounding and associated with the home," where "the intimate activity associated with the sanctity of a man's home and the privacies of life" occur. *Oliver v. United States*, 466 U.S. 170, 180 (1984) (internal quotations and citations omitted). To determine whether an area falls within the curtilage of a home, the Court considers four factors:

1) the proximity of the area claimed to be curtilage to the home,
2) whether the area is included within an enclosure surrounding the home,
3) the nature of the uses to which the area is put, and
4) the steps taken by the resident to protect the area from observation by people passing by.

*United States v. Dunn*, 480 U.S. 294, 301 (1987) (formatting added). In *Dunn*, the Court held that a barn was not curtilage, in part because the barn was unenclosed and sixty yards from the home. *Id.* As an example, in *Ysasi v. Brown*, this Court held that an area inside a fence was curtilage when a six-foot high, chain-linked fence surrounded the home, the gates were padlocked shut, the fence was approximately 100-yards from the home, and the plaintiff's dumpster was outside the fence. *Ysasi v. Brown*, 3 F. Supp. 3d 1088, 1152 (D.N.M. 2014).

Probable cause is required for an officer to search the curtilage of someone's home. *See Oliver*, 466 U.S. at 178. However, an officer may search an open field without probable cause, even if it is privately owned. *See Hester v. United States*, 265 U.S. 57, 59 (1924). Probable cause is not required because an open field is neither a "house[]" nor an "effect[]," which are protected by the Fourth Amendment. *Oliver*, 466 U.S. at 176 (quoting U.S. CONST. amend IV). "An individual may not legitimately demand privacy for activities conducted out of doors in fields." *Id. at* 178.

An officer has "an implied license to enter a home's curtilage to knock on the front door, seeking to speak with the home's occupants." *Carloss*, 818 F.3d at 992 (citing *Florida v. Jardines*, 569 U.S. 1, 8 (2013)). This procedure is often called a "knock and talk." *Id.*; *see also Kentucky v. King*, 563 U.S. 452, 469 (2011) ("[W]hen law enforcement officers who are not armed with a warrant knock on a door, they do no more than any citizen might do."). This implied license can be revoked. *Carloss*, 818 F.3d at 994–95. Notably, case law does not clearly define what physical alterations to a home revoke the implied license to conduct a knock and talk. *Cf. id.* at 990, 996–97 (holding that the implied license to enter was not revoked when homeowners posted "No Trespassing" signs in the yard and a "Posted Private Property Hunting, Fishing, Trapping or Trespassing for Any Purpose Is Strictly Forbidden Violators Will Be Prosecuted" sign on the door); *but see Edens v. Kennedy*, 112 F. App'x 870, 875 (4th Cir. 2004) (per curiam) (unpublished) (holding that implied license to enter was revoked when an owner enclosed their home's curtilage with a fence, locked the gate, and posted "No Trespassing" signs). As such, it is not clearly established that a chain-linked, see-through fence with a locked gate around the curtilage of someone's home revokes the implied license to approach the front door.

### i.  The curtilage of the Nidiffer-Francese home extends to the locked gate.

First, the open fields doctrine does not apply to the facts of this case because the area between the plaintiffs' gate and their front porch is curtilage. Applying the *Dunn* factors, the curtilage of the Nidiffer-Francese home extends to the locked gate.

The first *Dunn* factor, "the proximity of the area claimed to be curtilage to the home," suggests that the plaintiffs' front yard is curtilage. In *United States v. Cousins*, the Tenth Circuit found that the proximity factor suggested a side yard was curtilage because the yard "was

10

immediately adjacent to the house." 455 F.3d 1116, 1122 (10th Cir. 2006). Here, the area claimed to be curtilage is the area between the plaintiffs' locked gate and their front porch. Doc. 45 at 8. Just as in *Cousins*, the plaintiffs' front yard immediately abuts their home. The distance between the house and the gate is less than the length of the plaintiffs' driveway. Doc. 41, CD 0:05:12-0:06:10 (Exh. A). While neither party describes the distance between the start of the home and the gate, the video shows that the plaintiffs' driveway is not much longer than a standard, multicar driveway. *Id.*; *see also* Doc. 40 at 13 (defendants stating the gate and home are "some distance away" without further specificity). Notably, the plaintiffs' entire property is less than an acre. Doc. 45 at 8. As to this *Dunn* factor, defendants argue only that the distance was "great enough such that Nidiffer did not hear any of Officer Lovato's attempts to get his attention by sounding the airhorn." Doc. 40 at 13. I am not persuaded by this argument. This metric is too unreliable a measure of distance.  I estimate the distance between the home and the gate is approximately three car lengths. As such, the proximity factor suggests that Nidiffer-Francese front yard is curtilage.

The second *Dunn* factor, "whether the area is included within an enclosure surrounding the home," squarely falls in the plaintiffs' favor. The plaintiffs' property is entirely fenced in. Doc. 45 at 8. Defendants argue that the fence is "not immediately adjacent to the home." Doc. 40 at 13.  They state that this case is "nearly identical" to *Rieck v. Jensen*, 651 F.3d 1188 (10th Cir. 2011). Doc. 40 at 10. In *Rieck*, the Tenth Circuit found that "a gated perimeter fence around the acreage of the property is 'not the sort of enclosure surrounding the home contemplated by *Dunn*.'" Doc. 40 at 12 (quoting *Rieck*, 651 F.3d at 1193). Yet, defendants omit that the property enclosed by a fence in *Rieck* was seventeen acres. 351 F.3d at 1193. In contrast, the Nidiffer-Francese home is on less than one acre of land. Doc. 45 at 8. The fence around the plaintiffs'

home "plainly demarks the area that is part and parcel of the house." *See Dunn*, 480 U.S. at 295.

As such, the second *Dunn* factor also indicates that the Nidiffer-Francese front yard is curtilage.

The third *Dunn* factor, "the nature of the uses to which the area is put," neither helps nor

hurts plaintiffs. Here, just as in *Ysasi*, neither party describes the use of the front yard. *See Ysasi*,

3 F. Supp. at 1152 (finding that the area within a locked gate was curtilage). As to the third *Dunn*

factor, the defendants argue that "the driveway abuts and is clearly visible from the public

roadway." Doc. 40 at 13. Presumably, defendants intend to argue that the driveway is not

"a suitable setting for intimate activities associated with a home," because it is visible from the

road, as the court found in *Rieck*. *See* 351 F.3d at 1193. Yet, an area does not cease to be

curtilage merely because it is outdoors or visible to the public. *Cf. Oliver*, 466 U.S. at 178. The

videos show that the driveway was put to the conventional use of holding cars. Doc. 41, CD

0:05:12-0:06:10 (Exh. A). The front yard does not appear to be used for any business,

agricultural, or other non-residential purposes. The nature-of-use factor does not weigh in favor

of or against plaintiffs.

The fourth *Dunn* factor, "the steps taken by the resident to protect the area from

observation by people passing by," weighs in plaintiffs' favor. Plaintiffs claim they "have clearly

established curtilage by maintaining a continuous perimeter fence and keeping all gates locked."

Doc. 45 at 8. Defendants argue that "nothing obstructed the field of view of the length of the

driveway from the roadway." Doc. 40 at 13. While defendants are correct that the driveway is

visible from the street, plaintiffs' home and yard are obscured by large trees. Doc. 41, CD

0:05:12-0:06:10 (Exh. A). If the driveway was similarly obscured by a line of trees, it would

cease to function as a driveway. *See, e.g., United States v. Diehl*, 276 F.3d 32, 39 (1st Cir. 2002)

("*Dunn's* requirement that a resident make efforts to avoid 'observation by people passing by,' . .

. surely does not require efforts to insure total insulation at all times.") (internal citation omitted).

Just like the plaintiffs in *Ysasi*, Mr. Nidiffer and Ms. Francese went out of their way to install a

chain-linked fence around their property, which they locked with a chain and padlock. Doc. 45 at

8. Shy of building an opaque and solid wall, there is not much more plaintiffs could have done to

protect their home from observation. Therefore, the fourth *Dunn* factor also suggests that the

plaintiffs' front yard is curtilage.

Three of the four *Dunn* factors weigh in favor of the plaintiffs' curtilage extending to

their locked gate. The remaining *Dunn* factor neither cuts against nor supports plaintiffs' claim.

As such, the Court concludes that the plaintiffs' curtilage extends to their locked gate, and

therefore, the area is not an open field.

### ii.    Defendants did not conduct a lawful knock and talk.

Defendants argue that they merely conducted a lawful knock and talk when they jumped

over plaintiffs' fence. Doc. 40 at 13–17. Plaintiffs argue that "[a] knock-and-talk is not a

valid procedure if the officers must jump over a locked gate in order to obtain consent for a

conversation." Doc. 45 at 8. I find that the defendants' knock and talk was not lawful.

The plaintiffs revoked the implied license to enter their home's curtilage. To begin, the

plaintiffs' home is in a relatively residential area. *See Carloss*, 818 F.3d at 1000 (Tymkovich, J.,

concurring) (stating that a locked gate in a residential context imparts additional meaning in the

implied license context). Their chain-linked fence surrounded their home. Doc. 45 at 8. When the

officers arrived, the gate was locked with a chain and padlock. Doc. 45 at 8; *see Edens*, 112 F.

App'x at 875 ("[I]n the absence of a warrant or exigent circumstances, a police officer may not

lawfully breach a locked enclosure around the curtilage."). This locked gate in the residential

context would have signaled to a reasonable observer that they did not have an implied license to

approach the home's front door. *See United States v. Holmes*, 143 F. Supp. 3d 1252, 1262 (M.D. Fla. 2015) (collecting cases where Florida federal district courts found knock and talks unconstitutional when an officer had to jump over a gate to access the home); *see also United States v. Shuck*, 2012 WL 39391, at *5 n.5 (N.D. Ok1a. Jan. 9, 2012) (unpublished) ("[T]his Court is not inclined to condone police unilaterally scaling a locked gate."). A reasonable observer would not have believed they had license to approach the plaintiffs' front door. That is not to say that a locked gate always prohibits an officers' entry. *See, e.g.*, *United States v. Burton*, 894 F.2d 188, 190–91 (6th Cir. 1990) (holding that officers may climb over locked gates into an open field without a warrant). But in this case—where a fence enclosed the curtilage of the home, the gate was near the home, the gate was padlocked shut, the home is in a relatively residential area, and there were no other means of accessing the front door—the implied license to approach the front door was revoked.

A perimeter fence with a locked gate around the curtilage of a home is a stronger assertion of privacy than a "No Trespassing" sign. Defendants cite multiple Fourth Amendment cases involving "No Trespassing" or similar signs. Doc. 40 at 15 (citing *Carloss*, 818 F.3d at 994; *United States v. Bearden*, 780 F.3d 887, 893 (8th Cir. 2015) (involving an open driveway gate); *Covey v. Assessor of Ohio County*, 777 F.3d 186, 193–94 (4th Cir. 2015) (involving an open driveway gate in a rural area); *Holloran v. Duncan*, 92 F. Supp. 3d 774, 787–88 (W.D. Tenn. 2015) (involving an open field)). Defendants are correct that a "No Trespassing" sign alone would not revoke the implied license to enter curtilage. *Carloss*, 818 F.3d at 995. Defendants argue, that "[i]n the absence of any such signs, it stands to reason that Officers Campos, Lovato, and Sisemore objectively understood they had an implied license to approach Plaintiffs' home." Doc. 40 at 15–16. Yet, none of the cases defendants cite involve these

circumstances, that is, a fence surrounding the curtilage of a home with a locked gate. In *Carloss*, the Tenth Circuit reasoned that several "No Trespassing" signs "would not have conveyed to an objective officer, or member of the public, that he could not walk up to the porch and knock on the front door and attempt to contact the occupants." 818 F.3d at 997. An officer without a warrant is only entitled to the same access as a private citizen. *Florida*, 569 U.S. at 8. Surely, the "Nation's Girl Scouts and trick-or-treaters" would not see a stranger's locked fence as an invitation to climb over it to approach the door. *See id*. A fence around a home with a padlocked gate more clearly indicates to an observer that that they may not enter than a "No Trespassing" sign.  Hence, the I find defendants' cited cases unpersuasive.

Because I find that the officers did not have implied license to conduct a knock and talk, I do not address defendants' argument that they did not exceed the scope of that implied license. *See* Doc. 40 at 16–17.

The officers did not have implicit license to climb over the plaintiffs' locked gate to approach the front door. Therefore, I find that the knock and talk was not lawful.

### iii. Defendants did not violate a clearly established constitutional right.

Because the area inside plaintiffs' fence is within the curtilage of their home and there was no implied license to enter, the plaintiffs' Fourth Amendment rights were violated when the officers climbed over the locked gate into the plaintiffs' front yard. However, whether a right is violated is not the end of the inquiry. Because it is not "clearly established" that an officer may not climb over a locked gate into the curtilage of a home to simply knock on the door, the defendants did not violate plaintiffs' clearly established constitutional right. *See Anderson*, 483 U.S. at 640.

 Neither the Supreme Court, the Tenth Circuit, nor a consensus of the other circuits have

clearly held that a locked gate around the curtilage of a home revokes the implied license to conduct a knock and talk. *See Fogarty*, 523 F.3d at 1161.[3] Plaintiffs do not point to, and this Court is not aware of, any Supreme Court or Tenth Circuit case law holding that an officer may not climb over a locked gate to conduct a knock and talk. Nor have a consensus of other circuits held the same. While in *Rieck*, the Tenth Circuit condoned an officer opening an unlocked gate, as discussed above, *Rieck* meaningfully differs from this case because it involved an open field. 651 F.3d at 1193–94. Further, the rights violation in this case is relatively minor. *See Pierce*, 359 F.3d at 1298 ("[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation."). The contours of the law on revocation of implied license to enter curtilage are not "sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." *Anderson*, 483 U.S. at 640.

   While certainly mistaken, the officers' decision to climb the fence to approach the front door was reasonable. *See San Francisco*, 575 U.S. at 611. After sounding an air horn twice, the officers reasonably were at a loss for other means of calling the plaintiffs' attention to their presence. There was no intercom or buzzer for the officers to announce their presence to the homeowners. In this context, it would be unreasonable to expect an officer to intuit that climbing over the plaintiffs' fence would subject them to civil damages. The undisputed facts reveal that the officers' actions were far from "incompetent" or a knowing violation of the law. *See Mullenix*, 577 U.S. at 12.

---

[3] *But see Carloss*, 818 F.3d at 999–1004 (Tymkovich, J., concurring) (suggesting that a residential fence with a locked gate would revoke the implied license to enter); *id.* at 1004–15 (Gorsuch, J., dissenting) (arguing that both a fence and a single "No Trespassing" would revoke the implied license to enter). However, concurring and dissenting opinions do not establish law.

Because the defendants did not violate the plaintiffs' clearly established constitutional rights by climbing over the locked fence, the defendants are entitled to qualified immunity as to Count I.

### C.  Defendants are entitled to qualified immunity as to Count II.

In Count II, Mr. Nidiffer alleges that the defendants conducted an unreasonable search by calling the NMDOH to access his "private medical information." Doc. 77 at 4. In defendants' Motion for Summary Judgment, they argue that they did not conduct an unreasonable search. Doc. 40 at 20. Defendants state that they called the NMDOH "to check to see if Thomas [Nidiffer] was a licensed [medical marijuana] grower for the State of New Mexico." Doc. 40 at 20. They contend that Mr. Nidiffer did not have a reasonable expectation of privacy as to the NMDOH database because a state statute authorizes law enforcement to access such information. *Id.* at 17–20. Mr. Nidiffer[4] argues that he did not consent to the officers' call. Doc. 45 at 9. He also "doubt[s] the existence of the phone call." *Id.* I agree with defendants that Mr. Nidiffer's Fourth Amendment rights were not violated by the phone call. Therefore, the defendants are entitled to qualified immunity as to Count II.

As a threshold matter, Mr. Nidiffer has two competing factual theories regarding the phone call. First, in the complaint, he argues that the phone call violated his right to be free from unreasonable searches. Doc. 77 at 4. Then, in his response to defendants' motion for summary judgment, Mr. Nidiffer questions whether the phone call exists. Doc. 40 at 9. The summary

---

[4] While unlikely, to the extent that plaintiffs intended Count II to also be made on Ms. Francese's behalf, Ms. Francese lacks standing to assert violations of Mr. Nidiffer's Fourth Amendment rights. *See Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.") (citations omitted).

judgment standard requires the Court to "view the facts and draw all reasonable inferences in the light most favorable to the non-movant." *See Scott*, 550 U.S. at 378. Mr. Nidiffer's alternative theory that the phone call never happened defeats his own claim. Without a phone call, the call cannot have violated the plaintiff's Fourth Amendment rights. Therefore, Count II would fail for failure to state a claim. *See* FED. R. CIV. P. 12(b)(6). For that reason, I find that it would be more beneficial to Mr. Nidiffer to infer that the officers actually did make the phone call inquiring whether he is a licensed medical marijuana grower.

The Fourth Amendment protects against unreasonable searches when a person has a "reasonable expectation of privacy." *Smith v. Maryland*, 442 U.S. 735, 740 (1979). To determine whether someone has a reasonable expectation of privacy, the Court first looks to whether the individual has an actual, subjective expectation of privacy. *Id.* Second, the Court looks to whether a person's expectation of privacy is "one that society is prepared to recognize as 'reasonable.'" *Id.* (quoting *Katz v. United States*, 389 U.S. 347, 361 (1967)). In *Douglas v. Dobbs*, the Tenth Circuit recognized a constitutional right to privacy in prescription drug records. 419 F.3 1097, 1102 (10th Cir. 2005). At the same time, the Tenth Circuit explained "state law can operate to diminish the privacy expectation in prescription drug records." *Id.* at n.3.

The Lynn and Erin Compassionate Use Act, NM Stat. Ann. § 26-2B-1 *et seq.* is the New Mexico law authorizing the use of medical marijuana by people with debilitating medical conditions. *See* N.M. Stat. Ann. § 26-2B-2 (2007). The act empowered NMDOH to develop a licensure program for medical marijuana producers. N.M. Stat. Ann. § 26-2B-7(A)(5) (2007). The department issues two classes of marijuana production licenses: personal production and non-profit production. N.M. Admin. Code 7.34.4.8. Only personal production licenses are confidential. *See* N.M. Admin. Code 7.34.4.34. Still, the list of personal production license

18

holders and applicants may be disclosed "to authorized employees of state or local law enforcement agencies, but only for the purpose of verifying that a person is lawfully in possession of the license to produce." N.M. Admin. Code 7.34.4.34(B). All personal production license holders are also registered medical marijuana users. N.M. Admin. Code 7.34.4.8(A)(1).

There is no reasonable expectation of privacy regarding the list of people on the New Mexico medical marijuana registry.[5] As the Tenth Circuit recognized in *Douglas*, a statute can modify a reasonable expectation of privacy. 419 F.3d at n.3. Under the Lynn and Erin Compassionate Use Act, law enforcement is entitled to know whether someone is licensed to personally produce marijuana for the "purpose of verifying that a person is lawfully in possession of the license to produce." N.M. Admin. Code 7.34.4.34(B). There is an identical statutory provision pertaining to the list of people licensed to use medical marijuana. *See* N.M. Stat. Ann. § 26-2B-7(G)(2).

Here, the officers were verifying whether Mr. Nidiffer was in possession of a license to produce medical marijuana. Mr. Nidiffer argues that because he did not claim to be a registered medical marijuana grower, the officers were not authorized to call to verify that he was one. Doc. 45 at 9. Yet, the officers had an alternate reason for verifying that Mr. Nidiffer was licensed to grow medical marijuana because they received a report that someone was growing marijuana on Mr. Nidiffer's property. Doc. 40 at 4. Further, the existence of a provision allowing officers to verify who is on the state medical marijuana registry demonstrates that society does not expect

---

[5] Tenth Circuit case law implies but does not hold that there is a right to privacy regarding whether someone is prescribed medical marijuana generally. *See, e.g., Douglas v. Dobbs*, 419 F.3d 1097, 1102 (10th Cir. 2005) (recognizing a constitutional right to privacy in prescription drug records); *Herring v. Keenan*, 218 F.3d 1171, 1173 (10th Cir. 2000) (recognizing a constitutional right to privacy in non-disclosure of medical information by government officials). Because it is not necessary to the conclusion, I do not address the issue here.

such information to be private. *See Smith*, 442 U.S. at 740. Because New Mexico law authorizes

law enforcement to access the list of people on the medical marijuana registry, Mr. Nidiffer

could not reasonably expect privacy regarding law enforcement obtaining this information.

To the extent that the officers asked the NMDOH whether Mr. Nidiffer has a non-profit

production license, that information is public. Further, whether someone is a non-profit producer

of marijuana does not implicate any private medical information. Therefore, there is not a

reasonable expectation of privacy regarding whether Mr. Nidiffer is a licensed non-profit

producer of medical marijuana either.

Finally, Mr. Nidiffer fails to establish a genuine issue of material fact as to the content of

the subject phone call. In plaintiff's response to the defendants' motion for summary judgment,

plaintiff disputes the contents of the call "as [he has] not heard the phone call." Doc. 45 at 7. At

the least, he contends that the officers inquired about "personal private medical information" on

the call. Doc. 77 at 4. The defendants state they called the NMDOH to "check to see if [Mr.

Nidiffer] was a licensed [medical marijuana] grower for the State of New Mexico." Doc. 40 at

19. While the parties did not produce a recording of the call, the defendants met their burden of

establishing that there is no genuine issue regarding the contents of the call by producing a time-

stamped police report explaining the contents of the call. Doc. 40-1 at 1–2. So then, the burden

moved to the plaintiff to detail "specific facts, supported by admissible evidence, which

demonstrate the presence of a genuine issue for trial." *Celotex Corp v. Catrett*, 477 U.S. 317, 324

(1986). Drawing an inference in favor of the plaintiff, the "private medical information" Mr.

Nidiffer refers to is whether he has been prescribed medical marijuana, a prerequisite for

receiving a personal production license. Other than that, Mr. Nidiffer fails to point to any private

medical information that the defendants requested from the NMDOH. He fails to provide

"specific facts" that demonstrate a *genuine* issue of material fact relating to the contents of the call. As such, I find that the contents of the call are not at genuine issue.

Because Mr. Nidiffer did not have a reasonable expectation of privacy, the officers did not violate his Fourth Amendment right by calling the NMDOH to ask whether he is a licensed medical marijuana grower. The officers are entitled to qualified immunity regarding Count II.

## V.  Recommendations

I find that the three defendants are entitled to qualified immunity as to both counts. Because defendants have qualified immunity, I recommend the Court GRANT the Defendants' Motion for Summary Judgment (Doc. 40) and DENY the Plaintiffs' Motion for Summary Judgment (Doc. 45). Accordingly, I recommend the Court deny the parties' requests for a hearing. *See* Docs. 52, 53; *see also Geear v. Boulder Community Hosp.*, 844 F.2d 764 (10th Cir. 1988) (citation omitted) (holding that "the parties' right to be heard [on summary judgment] may be fulfilled by the court's review of the briefs and supporting affidavits and materials submitted to the court").

Plaintiffs have two pending motions to amend punitive damages. Docs. 29, 62.  Because I recommend that the Court find for the defendants on both counts, plaintiffs are not entitled to damages. Both motions will be mooted upon entry of an order adopting this proposed finding and recommended disposition. Therefore, I recommend the Court also DENY the plaintiffs' motions to amend damages (Docs. 29, 62).

Finally, I recommend that the Court dismiss the case with prejudice.

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  Written objections must be both timely and specific.  *United States v. One Parcel of Real Prop., With Buildings, Appurtenances, Improvements, & Contents, Known as: 2121 E. 30th St., Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996).  A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  Failure to file timely and specific objections will result in waiver of *de novo* review by a district or appellate court.  *Id*.  In other words, if no objections are filed, no appellate review will be allowed.**

_____
JENNIFER M. ROZZONI
United States Magistrate Judge